FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SERENITY INVESTMENTS, LLC, EMMA CUADRADO, in her capacity as Trustee of the Daniel V. Tierney 2011 Trust, | No. 24-6686 |
| | D.C. No. 4:22-cv-01623-YGR |
| *Plaintiffs*, | |
| v. | OPINION |
| SUN HUNG KAI STRATEGIC CAPITAL, LTD., | |
| *Defendant-Third-Party-Plaintiff - Appellant*, | |
| v. | |
| ORRICK HERRINGTON & SUTCLIFFE, LLP; SCENIC ADVISEMENT, INC., | |
| *Third-Party-Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted February 11, 2026
San Francisco, California

Filed July 29, 2026

Before: N. Randy Smith, Jacqueline H. Nguyen, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez

## SUMMARY[*]

### California Law / Conversion

Reversing the district court's summary judgment in favor of Orrick, Herrington & Sutcliffe LLP and Scenic Advisement, and remanding for further proceedings, the panel held that under California law conversion is a strict liability tort for which equitable indemnity is available against negligent joint tortfeasors.

Plaintiffs Serenity Investments, LLC and Daniel V. Tierney 2011 Trust entered into a stock transfer agreement with Sun Hung Kai Strategic Capital, Ltd. ("SHK"), with Orrick serving as plaintiffs' administrative agent to transfer the stocks and Scenic serving as plaintiffs' broker and placement agent. After a series of errors occurred in connection with the stock transfer, plaintiffs commenced this action against SHK, including a claim for conversion. SHK

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

filed a third-party complaint against Orrick and Scenic, asserting claims for equitable indemnity and statutory contribution based on their alleged negligence in handling the transaction. The district court granted Orrick and Scenic's motion for summary judgment as to SHK's equitable indemnity claim, holding that conversion is an intentional tort for which equitable indemnity is not available.

Based on recent precedent from the California Supreme Court in *B.B v. County of Los Angeles*, 471 P.3d 329 (Cal. 2020), and *Voris v. Lampert*, 446 P.3d 284 (Cal. 2019), the panel held that the tort of conversion is a strict liability offense that does not depend on the wrongful intent of the defendant, and therefore a conversion tortfeasor may seek partial equitable indemnity from concurrent negligent tortfeasors. Accordingly, the panel held that the district court erred in granting summary judgment on the ground that SHK may not seek equitable indemnity for its alleged conversion, and reversed and remanded for further proceedings.

## COUNSEL

Joseph P. McMonigle (argued), T. John Fitzgibbons Jr., and John B. Sullivan II, Long & Levit LLP, San Francisco, California; Alan Smith (argued) and Edward S. Zusman, Markun Zusman Freniere & Compton LLP, San Francisco, California; for Third-Party-Defendants–Appellees.

Hung G. Ta (argued) and JooYun Kim, Hgt Law, New York, New York, for Defendant-Third-Party-Plaintiff–Appellant.

**OPINION**

SANCHEZ, Circuit Judge:

In this appeal we resolve a question of California law: whether conversion is an intentional tort that precludes the recovery of equitable indemnity from joint tortfeasors. Guided by recent precedent from the California Supreme Court, we hold that the tort of conversion is a strict liability offense that does not depend on the wrongful intent of the defendant, and therefore a conversion tortfeasor may seek partial equitable indemnity from concurrent negligent tortfeasors. We reverse the district court's grant of summary judgment and remand for further proceedings.

**I.**

Plaintiffs Serenity Investments, LLC and Daniel V. Tierney 2011 Trust entered into a stock transfer agreement with Defendant Sun Hung Kai Strategic Capital Ltd. ("SHK") on August 21, 2017. Under that agreement, Plaintiffs were to sell 101,640 shares of Social Finance, Inc. ("SoFi") Series E Preferred Stock to SHK for $1,641,486. Orrick, Herrington & Sutcliffe LLP ("Orrick") served as Plaintiffs' administrative agent to transfer the stocks. Scenic Advisement ("Scenic") served as Plaintiffs' broker and placement agent.

On September 11, 2017, before SHK paid for the stock, SHK informed Scenic that it was placing the transaction "on hold" given negative news about SoFi's chief executive officer. Scenic relayed the information to Orrick the next day. Even though the transaction had been paused by SHK, Orrick transferred stock certificates for the 101,640 SoFi shares to SHK. On October 3, 2017, an SHK employee

notified Orrick, expressing confusion over the transfer given that SHK "had not yet agreed to the purchase." Orrick responded that SoFi might have crossed wires with the parties, but assured SHK that it could "unwind the transfer easily" and asked SHK to return the mistakenly issued stock certificates. Separately, Orrick emailed SoFi and instructed it to "roll back this transfer." SoFi replied that it would reverse the transaction in its system. SHK also alerted Scenic about the error. Scenic responded that "this was a mistake on [its] end" and "[s]hould not be a problem to rectify." It turned out, however, that SoFi never reversed the transfer.

In March 2018, an appraiser working with SHK's auditor alerted SHK that it owned 101,640 more Series E SoFi shares than were reflected in its records. In response to SHK's inquiry about the discrepancy, SoFi noted that SHK's holdings under PE-82 and PE-83—the two stock certificates corresponding to the stock transfer agreement at issue— amounted to 101,640 shares. SHK did not take any steps to reconcile this discrepancy.

That September, in connection with other SoFi transactions, Plaintiffs asked Scenic about the stock certificates it sent to Orrick pending the uncompleted sale with SHK. The record does not indicate what steps, if any, Scenic took to investigate the status of the stock certificates or to inform Plaintiffs that the certificates had been transferred to SHK in 2017.

Several years later, SoFi announced its plans to go public via a special purpose acquisition company ("SPAC"). In January 2021, SHK reached out to SoFi to confirm the number of shares it owned. SoFi informed SHK that SHK owned 101,640 more Series E shares than what was reflected

in SHK's records.  SHK executed an affidavit of lost stock certificate, representing under penalty of perjury that SHK was the owner of the shares comprising the PE-82 and PE-83 stock certificates.  SoFi then converted those shares into 177,138 SPAC shares and transferred them to SHK on or about July 19, 2021.

The following month, Plaintiffs contacted SoFi to find out why they had not received SPAC shares for their PE-82 and PE-83 holdings.  SoFi responded that those shares had been transferred to SHK and converted into SPAC shares in SHK's account.  On October 7, 2021, Plaintiffs' attorney contacted SHK about the inadvertent share transfer from 2017.  After several exchanges to investigate what had transpired, Plaintiffs provided SHK with instructions to transfer back the shares on October 29, 2021.  Rather than transfer the shares, SHK instead proposed paying Plaintiffs $1,641,486—the amount called for in the original stock transfer agreement.  At the time of the proposal, SoFi was trading at a high of $23.63 per share, meaning the inadvertently transferred shares (now 177,138 SPAC shares) were worth $4,185,771.

On November 7, 2021, Plaintiffs made a formal demand for the return of their shares.  Getting no response, Plaintiffs commenced this action against SHK.  SHK eventually returned the shares to Plaintiffs on January 14, 2022.  On that day, SoFi traded at a high of $13.32 per share, meaning that the total value of the shares had diminished to $2,359,478.

Plaintiffs alleged claims against SHK for conversion, receipt of stolen property, fraud, and negligent misrepresentation.  The district court granted SHK's motion to dismiss the fraud and negligent misrepresentation claims.  SHK filed an answer and a third-party complaint against

Orrick and Scenic, asserting claims for equitable indemnity and statutory contribution based on their alleged negligence in handling the transaction.  The district court granted Orrick and Scenic's motion for summary judgment as to SHK's equitable indemnity claim, holding that conversion is an intentional tort for which equitable indemnity is not available.[1]  Plaintiffs subsequently settled their claims with SHK.  SHK timely appealed the district court's entry of judgment in favor of Orrick and Scenic.

## II.

We review a grant of summary judgment de novo. *Maner v. Dignity Health*, 9 F.4th 1114, 1119 (9th Cir. 2021). We review "de novo the district court's application of state law." *Judd v. Weinstein*, 967 F.3d 952, 955 (9th Cir. 2020). "Absent controlling authority from the state supreme court, a federal court must predict how the highest state court would decide the state law issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 982 (9th Cir. 2022) (citation modified).

SHK contends that the district court erred in holding that conversion is an intentional tort for which equitable indemnity is not available against a negligent joint tortfeasor.  The stock purchase agreement provides, and the parties agree, that California law applies.

---

[1] By this point, SHK had withdrawn its statutory contribution claim.  In its summary judgment briefing, SHK did not dispute that receipt of stolen property is an intentional tort but argued that conversion is a strict liability tort for which equitable indemnity is applicable.

Two strands of California caselaw guide our analysis. The first concerns the state's equitable indemnity doctrine and the second the common law development of the tort of conversion. California's common law equitable indemnity doctrine enables "a concurrent tortfeasor [to] obtain partial indemnity from cotortfeasors on a comparative fault basis." *Musser v. Provencher*, 48 P.3d 408, 411 (Cal. 2002). The doctrine was developed "out of concern about the 'injustice of requiring one tortfeasor to bear an entire loss while another more culpable tortfeasor escaped with impunity.'" *B.B. v. County of Los Angeles*, 471 P.3d 329, 338 (Cal. 2020) (citation omitted); *see also United Servs. Auto. Ass'n v. Alaska Ins. Co.*, 114 Cal. Rptr. 2d 449, 453–54 (Ct. App. 2001) ("Equitable indemnity applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party." (citation omitted)).

California precedent establishes a dichotomy in the availability of equitable indemnity. "[U]nder 'comparative fault principles,' a right of partial indemnity exists as to the defendants in actions based on negligence and strict liability," but "intentional tortfeasors may not, under comparative fault principles, reduce their liability based on the negligent acts of others." *B.B.*, 471 P.3d at 342 (quoting *Safeway Stores, Inc. v. Nest-Kart*, 579 P.2d 441, 442 (Cal. 1978)).

The rule that an intentional tortfeasor may not seek indemnity from another negligent tortfeasor arises out of "the common sense notion that a more culpable party should bear the financial burden caused by its intentional act." *Weidenfeller v. Star & Garter*, 2 Cal. Rptr. 2d 14, 16 (Ct. App. 1991). California cases "reflect the common law determination that a party who commits intentional

misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor." *Id.* For example, in actions for battery, "[a]s between the guilty aggressor and the person attacked the former [could] not shield himself behind the charge that his victim may have been guilty of contributory negligence." *B.B.*, 471 P.3d at 338 (quoting *Bartosh v. Banning*, 59 Cal. Rptr. 382, 387 (Ct. App. 1967) (second alteration in original)). Similarly, comparative fault has no application to fraud by concealment, which involves "a deliberate, calculated act by [the defendant]." *Id.* at 341 (alteration in original) (quoting *Godfrey v. Steinpress*, 180 Cal. Rptr. 95, 106 (Ct. App. 1982)); *see also Riverhead Sav. Bank v. Nat'l Mortg. Equity Corp.*, 893 F.2d 1109, 1116 (9th Cir. 1990) ("Under California state law it is clear 'that a securities wrongdoer or anyone who has committed an active fraud cannot escape loss by shifting his responsibility to another party.'" (quoting *Stewart v. Am. Int'l Oil & Gas Co.*, 845 F.2d 196, 200 (9th Cir. 1988))).

Strict liability torts are different. The California Supreme Court recognizes that "even in cases in which one or more tortfeasors' liability rests on the principle of strict liability, fairness and other tort policies, such as deterrence of dangerous conduct or encouragement of accident-reducing behavior, frequently call for an apportionment of liability among multiple tortfeasors." *Safeway*, 579 P.2d at 445. It would "lead to bizarre, and indeed irrational, consequences," the court explained, if "a manufacturer who was actually negligent in producing a product would frequently be placed in a better position than a manufacturer who was free from negligence but who happened to produce a defective product." *Id.* at 446. Thus, based on "both 'common sense' and equitable considerations," California

recognizes that a strict liability defendant may seek equitable indemnity from negligent joint tortfeasors. *Id.* at 445.

As for the common law tort of conversion, California courts have at times described conversion as both an intentional tort and a strict liability tort in different contexts. But as we explain, the California Supreme Court has consistently held that conversion does not require proof of wrongful knowledge or intent, and more recently described conversion as a strict liability tort.

"Conversion is the wrongful exercise of dominion over the personal property of another." *Taylor v. Forte Hotels Int'l*, 1 Cal. Rptr. 2d 189, 192 (Ct. App. 1991). While "[t]he *act* must be knowingly or intentionally done," "a *wrongful intent* is not necessary." *Id.* (first citing *Poggi v. Scott*, 139 P. 815, 816 (Cal. 1914); and then citing 5 B.E. Witkin, *Summary of California Law* § 624 (9th ed. 1988)). As the California Supreme Court explained more than a century ago:

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action. The plaintiff's right of redress no longer depends upon his showing, in any way, that the defendant did the act in question from wrongful motives, or, generally speaking, even intentionally; and hence the

want of such motives, or of intention, is no defense. Nor, indeed, is negligence any necessary part of the case. Here, then, is a class of cases in which the tort consists in the breach of what may be called an absolute duty; the act itself (in some cases it must have caused damage) is unlawful and redressable as a tort.

*Poggi*, 139 P. at 816 (citation omitted).

The California Supreme Court reaffirmed in *Voris v. Lampert* that conversion does not require a wrongful intent or motive, holding that conversion is a strict liability tort ill-suited for claims seeking the recovery of unpaid wages in the workplace. 446 P.3d 284, 290 (Cal. 2019). *Voris* traced the roots of conversion to "the common law action of trover," which originated "as a remedy against the finder of lost goods who refused to return them to the owner" and later extended to "cases involving dispossession[] or withholding possession by others." *Id.* at 289–90 (citation modified) (quoting Restatement (Second) of Torts § 222A cmt. a (A.L.I. 1965)). "As it has developed in California, the tort comprises three elements: '(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages.'" *Id.* at 290 (quoting 5 B.E. Witkin, *Summary of California Law* § 810 (11th ed. 2017)).

"Notably absent from this formula," the state high court observed, "is any element of wrongful intent or motive; in California, conversion is a 'strict liability tort.'" *Id.* (quoting *Moore v. Regents of Univ. of Cal.*, 793 P.2d 479, 494 (Cal. 1990)). Conversion "does not require bad faith, knowledge,

or even negligence; it requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession." *Id.* at 296. For these reasons, *Voris* concluded that conversion is a strict liability tort and held that "a conversion claim is an awfully blunt tool for deterring intentional misconduct" involving unpaid wages, because allowing such claims to proceed would unduly burden employers who made good-faith mistakes. *Id.*; *see also Moore*, 793 P.2d at 494 (holding that "conversion is a strict liability tort" ill-suited for addressing the use of patient cells for medical research without informed consent).

The district court relied primarily on a California appellate court decision that characterized conversion as an intentional tort. *See Collin v. Am. Empire Ins. Co.*, 26 Cal. Rptr. 2d 391, 405 (Ct. App. 1994). At issue in *Collin* was whether conversion of real property constituted an "occurrence" or "accident" covered by an insurance policy. *Id.* at 399. *Collin* concluded that conversion cannot occur "accidentally," reasoning that "a necessary element of the tort is an intent to exercise ownership over property which belongs to another." *Id.* at 405.

*Collin* does not support Orrick and Scenic's view that conversion is an intentional tort for which equitable indemnity is unavailable. *Collin* was focused on the defendant's intent to exercise ownership over the real property because, in the context of insurance litigation, "California courts interpreting 'occurrence' have focused exclusively on the insured's intent to *perform the act* which gives rise to liability, not on the insured's state of mind." *Id.* at 403 (emphasis added).[2] Conversion is "intentional" in the

---

[2] Orrick and Scenic also point to *Phelps v. Superior Court*, where a California Court of Appeal reviewed a jury verdict that "d[id] not include

sense that "it requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession." *Voris*, 446 P.3d at 296; *see also Collin*, 26 Cal. Rptr. 2d at 405 (citing 5 B.E. Witkin, *Summary of California Law* § 624 (9th ed. 1988) ("The *act* must be knowingly or intentionally done, but a *wrongful intent* is not necessary.")). But conversion is a "strict liability" tort because it does not require "bad faith, knowledge, or even negligence" by the defendant for the plaintiff to recover. *Voris*, 446 P.3d at 296.

Bringing these two strands of caselaw together, we conclude that conversion is properly understood as a strict liability tort for purposes of permitting equitable indemnity from concurrent tortfeasors. Under California's equitable indemnity doctrine, the distinction between an intentional tortfeasor and a strict liability tortfeasor is grounded in terms of relative culpability, intentional misconduct, and social condemnation. *See Am. Motorcycle Ass'n v. Superior Ct.*, 578 P.2d 899, 910 (Cal. 1978) ("[E]quity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability."); *Weidenfeller*, 2 Cal. Rptr. 2d at 16 ("[A] party who commits intentional

---

a break-down of general damages as between damages resulting from intentional torts (conversion and battery) and damages resulting from negligence." 186 Cal. Rptr. 626, 633 (Ct. App. 1982). The court held that to be problematic because "[t]he lat[t]er damages are subject to apportionment [of fault between plaintiff and defendants], while the former are not." *Id*. *Phelps* did not provide any reasoning or citation as to why it regarded conversion as an intentional tort not subject to apportionment. California Court of Appeal decisions are persuasive, not binding, authority as to California law, *see Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024), and "unreasoned conclusions in [nonbinding] state decisions" are not persuasive, *Flowers v. Carville*, 310 F.3d 1118, 1125 (9th Cir. 2002).

misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor.") (citing Prosser & Keeton, *Torts* § 65 (5th ed. 1984) ("Intentional 'conduct differs from negligence . . . in the social condemnation attached to it.'")).

California courts have frequently described intentional torts in terms of the intent to injure. *See*, *e.g.*, *Stalnaker v. Boeing Co.*, 231 Cal. Rptr. 323, 328 (Ct. App. 1986) ("[A]n intentional tort is an act committed with either the specific intent to injure . . . or committed with the belief that such injury is substantially certain to occur."); *McDonell v. Am. Tr. Co.*, 279 P.2d 138, 140 (Ct. App. 1955) (describing an "intentional tort" as involving "a conscious, deliberate intent to injure the plaintiffs"). For this reason, statutory contribution is not permitted for "any tortfeasor who has intentionally injured the injured person." Cal. Civ. Proc. Code § 875(d). And in the analogous context of comparative negligence, "[u]nless a defendant has intentionally injured a plaintiff, he is entitled to a reduction in his liability to the plaintiff to the extent plaintiff's own negligence has contributed to the injury." *S. Pac. Transp. Co. v. California*, 171 Cal. Rptr. 187, 191 (Ct. App. 1981).

As discussed, a defendant liable for conversion need not have an intent to injure the plaintiff. *See Voris*, 466 P.3d at 296. Indeed, "bona fide purchasers of converted goods are ordinarily liable for conversion." *Regent All. Ltd. v. Rabizadeh*, 180 Cal. Rptr. 3d 610, 612 (Ct. App. 2014) (capitalization omitted). In this sense, conversion is more akin to strict product liability than to battery or fraud because it is not predicated on the wrongful intent of the defendant, and it does not invoke the same kind of social condemnation that would foreclose equitable indemnity. Thus, "equity and good conscience" militate in favor of allowing a conversion

tortfeasor to apportion liability. *United Servs. Auto. Ass'n*, 114 Cal. Rptr. 2d at 453.

The fact that a conversion defendant must nevertheless "have intentionally done the act depriving the plaintiff of his or her rightful possession," *Voris*, 446 P.3d at 296, does not dictate a contrary outcome. As SHK points out, "non-intentional torts (strict liability and negligent torts) often are predicated on an intentional act." For example, in *Safeway*, the California Supreme Court held that a shopping cart manufacturer subject to strict liability may seek indemnity from a supermarket that negligently maintained the cart. 579 P.2d at 445. Even there, the strict liability manufacturer had engaged in an intentional act of producing the shopping cart at issue. Yet "'common sense' and equitable considerations suggest[ed] that [the supermarket] should bear a proportionately greater share of liability for the accident." *Id.*

The district court also cited to SHK's conduct in this case—that it "did not follow up to ensure that SoFi corrected its records," did not "investigate the discrepancy in its shares," and "claimed to own those unpaid-for shares"—to show that SHK "commit[ed] intentional misconduct" and therefore "should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor." *Weidenfeller*, 2 Cal. Rptr. 2d at 16. However, *Safeway* did not carve out a different rule for product liability defendants who intentionally produced a defective product. *See* 579 P.2d at 444. Instead, California prescribed the availability of equitable indemnity in categorical terms based on the type of tort at issue. *See B.B.*, 471 P.3d at 342 ("[U]nder 'comparative fault principles,' a right of partial indemnity exists as to the defendants in actions based on negligence and strict liability." (citation omitted)). Under

equitable indemnity, the extent to which SHK is or is not culpable for Plaintiffs' injuries can be accounted for by the jury's comparative fault determination.

## III.

Conversion is not a tort that requires wrongful knowledge or intent under California law. Rather, in view of the California Supreme Court's recent cases in *Voris* and *B.B.*, we predict that the Court will find conversion to be a strict liability tort for which equitable indemnity is available against negligent joint tortfeasors. The district court erred in granting summary judgment on the ground that SHK may not seek equitable indemnity for its alleged conversion. We therefore reverse and remand for further proceedings consistent with this opinion.[3]

**REVERSED and REMANDED.**

---

[3] Orrick and Scenic argue, as alternative grounds for affirmance, that they are otherwise entitled to summary judgment. The district court did not decide these issues, and we decline to reach them. *See Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110 (9th Cir. 2020) ("In general, an appellate court does not decide issues that the trial court did not decide.").